UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   7/13/2020
```

ESTHEFANY HEREDIA,                                        :
ESLAINI FERNANDEZ, and                                  :        17 Civ. 06219 (RWL)
ESTELA TAVERAS,                                          :
Individually and on Behalf of all Other                 :
Persons Similarly Situated,                              :
                                                         :        **DECISION AND ORDER:**
                                        Plaintiffs,       :        **MOTIONS FOR**
                                                         :        **SUMMARY JUDGMENT**
                                                         :
                        - against -                      :
                                                         :
                                                         :
AMERICARE, INC., MARTIN KLEINMAN,                        :
And JOHN DOES #1-10,                                     :
                                                         :
                                        Defendants.      :

-----------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

This is a wage-and-hour case brought pursuant to the Fair Labor Standards Act,
the New York Labor Law, and common law in which Plaintiffs – home healthcare workers
– claim not to have been properly paid for the hours they worked.  The Defendants –
Americare, Inc. and Martin Kleinman – have moved for summary judgment on all claims.
Plaintiffs have cross-moved for summary judgment on their claims for unpaid overtime.
For the reasons that follow, Defendants' motion is GRANTED and Plaintiffs' motion is
DENIED.

### Factual Background[1]

Americare provides home healthcare services.  To deliver its services, Americare
employs home healthcare aides ("HHAs").  Defendant Martin Kleinman is Americare's
CEO.  (Pl. 56.1 Response ¶¶ 1-2.)

---

[1] The facts referenced throughout this opinion are based on the parties' Rule 56.1
statements of undisputed facts and responses thereto, as well as the exhibits,

Plaintiff Esthefany Heredia began working as an HHA with Americare at the end of January 2012.  As of her deposition in August 2018, Heredia no longer worked for Americare.  (*Id.* 45-46.)  Plaintiffs Eslani Fernandez and Estela Taveras have been employed as HHAs by Americare since 2010.  (*Id.* ¶¶ 78, 102.)

When they were hired, Plaintiffs received a number of materials setting forth policies and requirements concerning their employment.  These included, among others, a Handbook, a "List of Do's and Don'ts," and instructions regarding use of the telephonic "Santrax" system for reporting their daily hours and tasks performed.  (*Id.* ¶¶ 10-16.)

The Handbook requires HHAs to follow the plan of care developed for each patient. (*Id.* ¶ 11.)  HHAs typically provide a number of personal and household tasks, such as preparing meals, assisting with feeding, assisting the patient in and out of bed, chairs or wheelchairs, accompanying patient outdoors, bathing and dressing, light housekeeping duties such as sweeping, dusting, cleaning, vacuuming, changing and making beds, discarding trash, doing laundry, and going grocery shopping.  (*Id.*)

The plan of care also defines the extent of the services to be provided by the HHA. The Handbook thus instructs that HHAs are not expected to perform any household functions for household members other than the client and dependent children.  (*Id.* ¶12.) And, absent approval, the "List of Dos and Don'ts" prohibits the HHA from performing a service or patient care request that is not on the plan of care.  (*Id.* ¶ 10.)

---

declarations, affidavits and record evidence cited therein.  Unless otherwise noted, the facts set forth are undisputed.  *See* Plaintiffs' Rule 56.1 Statement Responding to Defendants' Rule 56.1 Statement of Uncontested Facts and Plaintiffs' Statement of Material Issues of Fact (Dkt. 137, "Pl. 56.1 Response"); Defendants' Counter Statement of Material Facts (Dkt. 159).

Each Plaintiff worked 24-hour live-in shifts, typically three or four days a week. (*See, e.g., Id.* ¶¶ 50, 63, 67, 91, 104.)  As compensation for 24-hour shifts, HHAs typically receive pay for 13 hours of time, deducting time for eight hours of sleep and three one-hour meal breaks.  (*Id.* ¶ 29.)

This lawsuit primarily concerns the extent to which Plaintiffs were properly paid for the type of work they performed and the number of hours worked, particularly when they did not receive the requisite sleep or breaks to justify payment for only 13 hours. Additional facts relevant to those and other issues are discussed in the context of the analysis that follows.

### Procedural Background

Plaintiffs filed this lawsuit on behalf of themselves and others similarly situated on August 17, 2020 claiming (1) violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"); (2) violations of the New York Labor Law §§ 650 et seq. ("NYLL"); (3) violations of the Wage Parity Act ("WPA") Minimum Wage Requirement; (4) breach of contract as third-party beneficiaries of an alleged WPA Contract with New York State; (5) breach of contract; and (6) unjust enrichment.  (Dkt. 1, the Complaint ("Compl.").)

Defendants moved to dismiss, which the Court denied on May 23, 2018.  *Heredia v. Americare, Inc.*, No. 17 Civ. 6219, 2018 WL 2372681 (S.D.N.Y. Mary 23, 2018) ("*Heredia I*").  That same day, the Court denied class certification under Federal Rule of Civil Procedure 23 but conditionally certified a collective of "[e]mployees who were not paid time and one half their regular hourly rates [for overtime work performed] on or after January 1, 2015."  *Heredia v. Americare*, No. 17 Civ. 6219, 2018 WL 2332068, at *5 (S.D.N.Y. May 23, 2018).  The collective action claims, however, have since settled, and

the collective opt-in plaintiffs have been dismissed from the case.  (*See* Dkt. 104 and Dkt. 110.)  Accordingly, at this juncture, the only plaintiffs are the three individuals, Heredia, Fernandez, and Taveras, and the relevant time period excludes January 1, 2015 to October 13, 2015 (which is encompassed by the settlement release).

Following multiple extensions requested by the parties, discovery closed on January 8, 2020.  (*See* Dkt. 113.)  On January 17, 2020, Defendants Americare and Kleinman moved for summary judgment on all claims.  (Dkt. 114.)  Plaintiffs submitted their opposition on February 27, 2020 and cross-moved for summary judgment on their claims for unpaid overtime.  (Dkt. 120.)  The motions were fully briefed as of April 10, 2020, and the Court heard oral argument on July 9, 2020.

## Summary Judgment Standard

The standard for summary judgment is well settled.  Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial burden of proving that there is no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal citations and quotations omitted). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  Similarly, "the mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 256.  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  *Id.* at 249-50.

Moreover, "the principles governing admissibility of evidence do not change on a motion for summary judgment . . . .  [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks and citation omitted).  Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein."  *Patterson v. County of Oneida, New York*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

In ruling on a motion for summary judgment, the court must resolve any ambiguity in favor of the nonmoving party.  *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004).  The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  When, as in this case, both sides move for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party."

*Wachovia Bank, National Association v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).

Summary judgment will not be granted where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citations and quotations omitted).

## Discussion

Defendants challenge the admissibility of Plaintiffs' declarations, affidavits and certain exhibits.  Accordingly, the Court will address that issue first.  The Court will then discuss the substance of the summary judgment arguments.

**I.      Inadmissibility of Plaintiffs' Affidavits, Declarations, Spanish Language Documents, and Evidence Not Disclosed During Discovery.**

In opposing Defendants' motion and in support of their own, Plaintiffs have submitted, among other items, five written statements in English from the three Plaintiffs; handwritten notes in Spanish that are not accompanied by certified translations; and evidence not produced during discovery.  Defendants contend these materials should be stricken or otherwise not considered by the Court.  The Court agrees.

**A.      Insufficiency of Plaintiffs' Affidavits and Declarations**

Plaintiffs' witness statements are deficient.   They consist, as titled, of one Declaration from each Plaintiff as well as an Affidavit from each of Fernandez and

Taveras.[2]   (*See* Dkt. 122, Declaration of Esthefany Heredia ("Heredia Decl."); Dkt. 123, Declaration of Eslaini Fernandez ("Fernandez Decl."); Dkt. 124, Declaration of Estela Taveras ("Taveras Decl."); Dkt. 138 (Affidavit of Estela Taveras ("Taveras Aff."); Dkt. 143 (Affidavit of Eslaini Fernandez ("Fernandez Aff.").)   Each instrument ends with the statement "My first language is Spanish and I do not speak English but have had this declaration translated for me and believe it to be correct."  (Heredia Decl. ¶ 42, Fernandez Decl. ¶ 33; Taveras Decl. ¶ 33; Fernandez Aff. ¶ 21, Taveras Aff. ¶ 18.)  Defendants fault each of the statements for not complying with the requirements for a written statement from a person whose native language is not English.

When, as here, a party relies on an English-language declaration of a person whose native language is not English, that party must "also submit documents sufficient to establish that [the declarant] understood what he was signing."  *Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 709 (S.D.N.Y. 2016); *see also Tangtiwatanapaibul v. Tom & Toon, Inc.*, No. 17 Civ. 816, 2018 WL 4405606, *3 (S.D.N.Y. Sept. 17, 2018) (quoting *Sicom*).  This requirement may be met in multiple ways.  For instance, the other document

---

[2] Although titled on their cover page as either a Declaration or Affidavit, each statement is composed so as to qualify as both an affidavit (subject to notarization) and a declaration.  The three declarations are recycled from Plaintiffs' collective certification motion.  While four of the statements are notarized, the Fernandez Declaration is not.  Defendants argue that this omission is an additional reason why the Fernandez Declaration cannot be considered.  Pursuant to 28 U.S.C. § 1746, however, a declaration need not be sworn so long as the statement is signed, dated and includes the averment: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct."  The Fernandez Declaration, and the four other Plaintiff statements for that matter, include the requisite incantation.  Accordingly, Defendants' additional argument with respect to the Fernandez Declaration is unavailing, although the declaration remains defective for the reasons set forth in the text.

can be a certified translation in the declarant's native language, so long as the declarant read the translation before he signed the English-language version. *Tom & Toon*, 2018 WL 4405606 at *3 (citing, as an example, *Espinoza v. 953 Associates. LLC*, 280 F.R.D. 113, 118 (S.D.N.Y. 2011)). The declarant can also sign the document written in his or her native language if counsel files the native-language document with a certified English-language translation. *Id.* (citing *Mattis v. Zheng*, No. 05 Civ. 2924, 2006 WL 3155843, at *1 n.1 (S.D.N.Y. Oct. 27, 2006)). "Alternatively, the declarant may submit a separate declaration indicating that the document has been translated, as long as it is clear that the declarant understood the contents of the document he signed." *Id.* (citing *Cuzco v. Orion Builders, Inc.*, 477 F. Supp. 2d 628, 634 (S.D.N.Y. 2007)).

Absent one of those means of assurance that the declarant understood what he or she was signing, courts may strike the declaration. In *Tom & Toon*, for example, the plaintiff's native language was Lao. Her declaration was signed in English and included the statement, "This document has been translated to me in my native language of Lao, and I fully comprehend the contents," but the declaration was not accompanied by any Lao translation. 2018 WL 4405606 at *3. The court therefore did not accept the declaration. *Id.* The declarations and affidavits here are similarly defective: they recite that the document has been translated (without specifying whether that was done orally or in writing) but are not accompanied by any Spanish translation. Indeed, the statements in this case are even more problematic. Rather than indicating that the signatories comprehended what they were signing, the statements tentatively assert "I believe [the declaration] to be correct." (*See, e.g.*, Taveras Aff. ¶ 18.) Plaintiffs also have not submitted a certified Spanish translation reviewed by them before signing their

declarations; nor have they provided Spanish-language versions of their declarations or affidavits accompanied by certified English translations.[3]

Some courts, including this one, have accepted English-language declarations from non-English speaking signatories "without dwelling on technical improprieties." *Espinoza*, 280 F.R.D. at 119, n.17; *see also Geng v. Shu Han Ju Restaurant II Corp.*, No. 18 Civ. 12220, 2019 WL 4493429, *16 (S.D.N.Y. Sept. 9, 2019) (citing *Espinoza* and accepting declarations in context of determining whether collective action should be conditionally certified). Here, however, in the context of summary judgment, where the admissibility of evidence is of particular concern, the Court declines to look past the improprieties. That said, and as discussed below, even were the Court to fully consider the declarations and affidavits, the Court's decision on the merits would be the same.

**B.    Absence of Certified Translations of Spanish-Language Documents**

Some of the exhibits submitted by Plaintiffs are written in Spanish. These include, in particular, handwritten notes from Fernandez and Taveras purportedly describing instances when they did not get sufficient sleep or breaks, and some of which they assert (by way of their defective affidavits) were faxed or emailed to their Americare coordinator. (*See* Fernandez Aff. ¶¶ 3-4, and Ex. A, B; Taveras Aff. ¶¶ 3-4 and Ex. A and B.) They also include Fernandez's notes about a purported telephone call she had with the supervising coordinator. (Fernandez Aff. ¶ 16 and Ex. F.)

---

[3] Even after Defendants identified the defects in the Plaintiffs' statements by arguing to strike them in their April 10, 2020 reply brief to Plaintiffs' opposition, Plaintiffs did not seek to cure the problem. They made no application to the Court for leave to submit revised or supplemental declarations or any Spanish-language translations reviewed by the Plaintiffs.

Plaintiffs have not, however, submitted certified translations, or any translations for that matter, of any of the Spanish-language documents.  The documents therefore are inadmissible.  It is a "well-established rule that a document in a foreign language is generally inadmissible unless accompanied by a certified English translation."  *Chen v. Wai? Café, Inc.*, No. 10 Civ. 7254, 2016 WL 722185, at *6 n.5 (S.D.N.Y. Feb. 19, 2016); *see also Sicom*, 168 F. Supp.3d at 709 & n.9 (foreign-language documents, even if authenticated, "cannot be reviewed or relied on by the Court . . . unless they are accompanied by certified translations into English"); *NV Petrus SA v. LPG Trading Corp.*, No. 14 CV 3138, 2017 WL 1905820, *2 (E.D.N.Y. May 8, 2017) (reminding parties "that they must provide certified translations of any foreign language documents that they seek to introduce at trial"); *Quiroga v. Fall River Music, Inc.*, No. 93-CV-3914, 1998 WL 851574, at *2 n.3 (S.D.N.Y. Dec. 7, 1998) ("Translations of foreign-language documents which are not certified as true and accurate translations and which do not even identify the translator are not properly authenticated and are not admissible evidence.").

The Spanish-language documents are inadmissible and will not be considered by the Court.  *See, e.g., Chen v. 2425 Broadway Chao Restaurant, LLC,* No. 16 Civ. 5735, 2019 WL 1244291, at *15 n.10 (S.D.N.Y. March 18, 2019) ("Exhibits 21 and 22 to that affidavit are untranslated-handwritten-Mandarin documents which the Court does not accept as evidence"); *Diaz v. City University of New York*, No. 13 Civ. 2038, 2017 WL 3088394, *7 n.9 (S.D.N.Y. July 20, 2017), adopted 2017 WL 4155400 (S.D.N.Y. Sept. 18, 2017) ("[The Court has] not considered any document in the record that is not translated into English."); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 704-05 (S.D.N.Y. 2014) (striking Defendants' exhibits that were entirely or partly in Spanish); *In re Advanced*

*Battery Technologies, Inc. Securities Litigation*, No. 11 Civ. 2279, 2012 WL 3758085, *9 (S.D.N.Y. Aug. 29, 2012) ("The fact that the ABAT Defendants failed to provide certified translations of the words that appear on the screen shots precludes my consideration of them").

## C.    Evidence Not Produced During Discovery

Defendants also seek to strike any materials that Plaintiffs include in their opposition that were not produced during discovery.  These materials primarily consist of the handwritten notes and emails in Exhibits A and B to both the Fernandez and Taveras Affidavits, which are inadmissible for lack of certified translations as explained above.  But even if the late-produced notes had the requisite translations, they would be subject to exclusion pursuant to Federal Rule of Civil Procedure 37.

The Federal Rules of Civil Procedure require that a party disclose documents that may be used "to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(ii).  Pursuant to Rule 26(e), a party is obligated to timely supplement or correct its initial Rule 26 disclosures, and its responses to interrogatories and document demands, "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  "The obligation to amend prior disclosures and discovery responses continues even after the conclusion of discovery."  *Lujan v. Cabana Management, Inc.*, 284 F.R.D. 50, 68 (E.D.N.Y. 2012) (citation omitted).

The discovery rules are intended to prevent the practice of "'sandbagging' an opposing party with new evidence."  *Capitol Records, LLC v. Escape Media Group, Inc.*, No. 12 Civ. 6466, 2015 WL 1402049, *21 (S.D.N.Y. March 25, 2015) (internal citations

11

omitted); *Lujan*, 284 F.R.D. at 68 ("The purpose of Rule 26(e) is to prevent the 'sandbagging' of a party with new evidence at trial or on a motion.")  Accordingly, the Court may bar use of evidence not produced by a party in violation of its discovery obligations.  Pursuant to Federal Rule of Civil Procedure 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

"A district court has wide discretion to impose sanctions, including severe sanctions, under [Rule] 37."  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir.2006); *see also Lujan*, 284 F.R.D. at 68 ("Courts enjoy broad discretion in deciding whether and how to fashion a sanction pursuant to Rule 37.").  In determining whether to exercise its discretion to preclude evidence under Rule 37, courts examine the so-called *Patterson* factors, namely (1) the party's explanation for the failure to comply with the discovery requirement; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to address the new evidence; and (4) the possibility of a continuance.  *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir.2006) (citation omitted).

The notes fall into two distinct groups based on the timing of their production.  On December 13, 2019 – the date for expiration of discovery – and again on December 18, 2019, Plaintiffs requested and received extensions of the discovery period until January 8, 2020.  (*See* Dkt. 102, 109, 111, 112, 113; Dkt. 158, Declaration of Shannon D. Azzaro in Further Support of Defendants' Motion for Summary Judgment ("Azzaro Reply Aff.") ¶¶ 4-7.)  The primary purpose of those extensions was to resolve issues related to

Defendants' production of documents in response to Plaintiffs' document requests. (Azzaro Decl. ¶¶ 5, 6,10.)  On December 18 and 19, 2019, however, Plaintiffs used the extended period to produce the first group of notes and related documents.  (*Id.* ¶¶ 8-9.) Plaintiffs then produced the second group of documents on February 5, 2020, four weeks after the close of discovery and almost three weeks after Defendants had filed their summary judgment motion.  (*Id.* ¶¶ 11-13.)

The dates appearing on the documents are also relevant to the analysis.  For instance, they bear various dates between October 6, 2019 and February 4, 2020, with respect to Taveras, and between October 2, 2019 and January 29, 2020, with respect to Fernandez.  The notes dated October and November and even early December could and should have been produced before December 13, 2019, the then pending discovery deadline.  Plaintiffs have provided no explanation for their late production.[4]  Similarly, the notes dated from the remainder of December and early January could and should have been produced before the extended discovery period ending January 8, 2020; instead, Plaintiffs held them until weeks after Defendants filed their motion.  Once again, Plaintiffs offered no explanation in their opposition for waiting to produce the documents after Defendants filed their summary judgment motion.

The remainder of the notes – dated as late as February 4, 2020 – presumably could not have been produced prior to filing of Defendants' motion because they were not

---

[4] To be sure, Plaintiffs produced the first group of notes prior to expiration of the extended discovery deadline, which they asked for and secured on December 13, 2020.  But at that point, Plaintiffs had been deposed, and the Plaintiffs had asked for the extension under the guise of other purposes.  (*See* Dkt. 109 (Plaintiffs requesting extension "to permit the parties to resolve a final issue related to documents relevant to the Wage Parity Act claims."); Azzaro Reply Decl. ¶¶ 8-9.)

created until after the motion was filed.  But given their timing, these notes, like all the others submitted by Fernandez and Taveras, obviously were created by Plaintiffs specifically for purposes of the litigation.  It is clear to this Court that Plaintiffs sought to manufacture evidence at the eleventh hour and "sandbag" Defendants, precisely what the discovery rules are intended to prevent.  *See Capitol Records,* 2015 WL 1402049, at *21; *Lujan*, 284 F.R.D. at 68.  The first *Patterson* factor thus favors exclusion.

The second factor, importance of the evidence, cuts against exclusion.  That is because the notes purportedly document instances where Plaintiffs had diminished sleep and breaktime that would entitle them to more pay.  Without the notes, the only evidence in the record is the Plaintiffs' say-so.

The third factor, prejudice to the Defendants, favors exclusion.  All the documents in question were produced after Plaintiffs had been deposed.  That prejudice could be cured in part by allowing additional depositions of Fernandez and Taveras and requiring Plaintiffs to pay the associated costs, but there would be no avoiding Defendants' having to revise and file a renewed motion for summary judgment.[5]  More significantly, because the notes all concern what happened while Plaintiffs were taking care of particular clients, discovery could well devolve into extended discovery of those clients or other third parties – including the sick and elderly who may have diminished memories or insufficient availability or ability to be deposed.  *See Peart v. City of New York,* 992 F.2d 458, 462

---

[5] Defendants also point out that they would incur additional burden in having to re-review corporate records to determine whether the purported faxed and emailed notes were actually received and to investigate the veracity of the claims.  As discussed later in this opinion, however, Americare already has investigated most or all of those claims and paid Plaintiffs for any additional verified time.

(2d Cir.1993) (recognizing prejudice where "some of [defendants'] witnesses likely would have been unavailable or their recollection of the events at issue may well have been diminished" had the case been further delayed, where underlying events had occurred over five years earlier); *Martell Strategic Funding, LLC v. American Hospitality Academy*, No. 12 Civ. 627, 2017 WL 2937649, at *4 (S.D.N.Y. July 10, 2017) (recognizing prejudice "because the passage of time could have resulted in a loss of memory by witnesses with knowledge of the events in question").  Diminished memory and availability are very much in play as the patients cared for by Plaintiffs are elderly, frail and, in some cases, afflicted with dementia.

The fourth factor – need for a continuance – also weighs in favor of exclusion.  A substantial continuance would be required for Defendants to conduct the discovery just described as well as to re-brief the summary judgment motion already filed.[6]  The current COVID-19 pandemic and its associated social-distancing practices and requirements are likely to make such discovery more complicated and extend the time period needed even further.[7]  This case has been pending for almost three years.  Plaintiffs had ample time to develop evidence supporting their claims.  They should not now be entitled to derail the litigation at the eleventh hour.

---

[6] Defendants are in part to blame for this.  Nothing in the record indicates that Defendants raised with the Court any concern about the first group of notes produced in December 2019; had they done so, some of the prejudice and delay now presented may have been avoided insofar as any additional discovery could have been sought and accomplished before Defendants filed their summary judgment motion.  Even so, a continuance would have been required to conduct that discovery.

[7] The Court takes judicial notice that extensions of discovery have been granted in numerous cases in this District as a result of complications presented by the pandemic.

Considering all the factors, and in light of the totality of circumstances, the Court finds in its discretion that excluding the late-produced notes is warranted as a sanction pursuant to Rule 37.   Of course, this is an alternative basis for exclusion as the documents, and the affidavits sponsoring them, are inadmissible for additional independent reasons (i.e., defective declarations/affidavits and absence of translations).

## II.   Plaintiffs' Minimum Wage and Overtime Claims

The crux of this case, set forth principally in Plaintiffs' First, Second and Fifth Causes of Action, is Plaintiffs' claim that they did not receive minimum wage and overtime pay due Americare HHAs who did not receive the sleep or breaks that would otherwise limit their 24-hour shift pay to a 13-hour day, or who performed general housekeeping services more than 20% of their time.   Defendants have submitted evidence that Plaintiffs were paid appropriately.   Plaintiffs are left with no basis to dispute that evidence because their declarations/affidavits and exhibits sponsored by them are stricken from the record for the reasons stated above.   But even if all of that evidence were considered, Defendants would still be entitled to summary judgment on Plaintiffs' minimum wage and overtime claims as explained next.[8]

### A.   Minimum Wage and Overtime Requirement

Under both the FLSA and NYLL, absent an applicable exemption, employers must pay covered employees a minimum wage and overtime for any hours worked in excess

---

[8] Plaintiffs' Complaint also included a "spread-of-hours" claim  under the NYLL.  Neither party addressed that claim in their summary judgment papers.   At oral argument, Plaintiffs' counsel conceded this was not an issue up until at least 2019, and Plaintiffs have pointed to no evidence that it was an issue during 2019.  To the extent the spread-of-hours is still a vestige of the Complaint, Defendants are entitled to summary judgment on that claim as well.

of 40 hours per week.  *See* 29 U.S.C. § 207(a); 12 N.Y.C.R.R. § 146-1.4.  The overtime rate under both statutes is one-and-a-half times the employee's regular rate of pay. *Nakahata v. New York – Presbyterian Healthcare Systems, Inc.*, 723 F.3d 192, 200 (2d Cir. 2013); *see* 29 U.S.C. §§ 207(a)(1); 12 NYCCR § 142-2.2.

**B.    24-Hour Shifts, Sleep and Meal Breaks**

The first ground for disagreement about whether Plaintiffs received appropriate minimum wages and overtime stems from the number of hours they worked in each 24-hour shift.  Employers in the home healthcare industry commonly assign employees to 24-hour sleep-in shifts during which employees are expected to work only thirteen hours, with eight hours deducted for sleeping and three hours deducted for meal breaks.  *Bonn-Wittingham v. Project OHR, Inc.*, 792 Fed. App'x 71, 74 (2d Cir. 2019).  That rubric tracks the FLSA, which permits an employer and employee to agree that "an employer can deduct up to eleven hours from a twenty-four-hour shift by deducting eight hours of sleep time (so long as five of those hours are uninterrupted), and up to three one-hour meal breaks." 29 C.F.R. § 785.22; *Carrasco v. Life Care Services, Inc.*, No. 17 Civ. 5617, 2017 WL 6403521, *5 (S.D.N.Y. Dec. 15, 2017).   "Working hours in the home health aide context are calculated in the same way under the NYLL, as recently confirmed by the New York Court of Appeals."  *Bonn-Wittingham*, 792 Fed. App'x at 74 (citing *Andryeyeva v. N.Y. Health Care, Inc.*, 33 N.Y.3d 152, 182-83 (2019)).

Here, Plaintiffs' indisputably agreed that Americare would deduct up to eleven hours from a 24-hour shift subject to the sleep and break qualifications.  (*See, e.g.,* Pl. 56.1 Response ¶ 29; Dkt. 115 (Declaration of Kevin J. O'Connor, Esq. in Support of Defendants' Motion for Summary Judgment ("O'Connor Decl.") Exs. E, Q, W (HHA "Live

In" agreements signed by Plaintiffs).)   Plaintiffs contend, however, that they regularly worked 24-hour shifts in which they did not get eight hours of sleep, five hours of uninterrupted sleep and/or three on-hour meal breaks, as a result of which they were not paid for the full number of hours they worked or paid the requisite overtime.   Defendants argue that they are entitled to summary judgment because the undisputed evidence shows that Plaintiffs were paid for any overtime properly reported to and verified by Americare, and because Plaintiffs did not follow the requisite procedures for reporting lack of sleep and breaks.[9]   To determine if there are disputed issues of material fact, it is helpful to look at three different time periods:  (1) 2016-17; (2) post-August 19, 2019; and (3) all other periods.

### 1. 2016-2017

Plaintiffs claim that they were not paid the overtime rate for hours in 2016 and 2017 that Defendants acknowledged were in fact compensable overtime.   As support, Plaintiffs point to paystubs for a variety of dates in 2016 and 2017 reflecting that each of the Plaintiffs worked overtime hours but received only the regular rate of pay.   (*See* Rand Decl. Exs. A (Heredia pay stubs), B (Fernandez pay stubs) and C (Taveras pay stubs).)

---

[9] Defendants expend considerable portions of their briefing and statement of material facts demonstrating that Plaintiffs failed to follow instructions and policies governing how to report their shortage of sleep and breaks, and that the absence of such reporting is proof that Plaintiffs did not forego the sleep or breaktime they now claim.  Plaintiffs dispute many of those factual assertions, including their having knowledge of special task codes denoting lack of sleep and breaktime for entry through the telephonic reporting system.  (*See, e.g.,* Pl. 56.1 Response ¶¶ 17-20, 22-24.)   The Court does not find it necessary to address this issue given the other bases for granting summary judgment discussed in the text.   *Cf. Rodriguez v. Avondale Care Group*, No. 16 Civ. 3084, 2018 WL 1582433, at * 7 (S.D.N.Y. March 27, 2018) (finding dispute about whether or not plaintiffs actually took allotted breaks was a credibility contest to be considered by the fact-finder).

But as explained and demonstrated by Americare's Vice President of Human Resources, every overtime hour reflected in those pay stubs was paid as reflected in later-issued pay stubs. (Falotico Decl. at ¶¶ 4-12 and Ex. 1-6.) There is no evidence to the contrary. Accordingly, Defendants are entitled to summary judgment on that portion of Plaintiffs' claims premised on alleged failure to pay for overtime acknowledged by Americare in 2016 and 2017.

### 2. Post-August 19, 2019

As described earlier in the context of discussing the inadmissibility of Plaintiffs' affidavits, declarations and certain exhibits, Plaintiffs Fernandez and Taveras have submitted copies of their handwritten notes purporting to document the hours of sleep and breaks they did or did not receive when working shifts between August 19, 2019 and February 4, 2020, as well as transmittal pages indicating that Fernandez and Taveras emailed or faxed some of the earlier notes to Americare. Plaintiffs contend they were not paid properly for the time reflected in those notes. The undisputed evidence shows otherwise.

To start, Plaintiff Heredia was not employed by Americare in 2019 or 2020, and accordingly has not presented any notes or other evidence as to any hours she worked during the August 2019 to February 2020 time period, let alone hours for which she was not paid during that time frame. Accordingly, Defendants are entitled to summary judgment with respect to any claim by Heredia for unpaid wages from August 2019 to February 2020.

Second, as explained previously, the Taveras and Fernandez notes are inadmissible for multiple reasons, including being sponsored by defective affidavits,

absence of certified translations, and failure to timely produce.  Plaintiffs thus are left without any evidence by which a reasonable jury could conclude that they were not properly paid during the time frame in question.

Third, even if the notes were admissible, summary judgment in favor of Defendants would still be warranted.  Defendants have submitted undisputed proof that Fernandez and Taveras received payment at the regular rate of pay for the verified additional regular hours they reported, and at the overtime rate for verified overtime hours they reported through December 2019.  (Dkt. 157, Declaration of Michele Falotico in Further Support of Defendants' Motion for Summary Judgment ("Falotico Decl.") ¶¶ 13-26 and exhibits referenced therein.)  Plaintiffs disavow any knowledge of what the payments are for but at the same time attempt to dismiss them as "settlement payments."  (Fernandez Aff. ¶ 19; Taveras Aff. ¶ 17.)  The payments, however, are not identified as such, and there is no documentation at all suggesting them to be so.  Rather, the earnings statements on which the payments appear reflect that all relevant payments are designated as Overtime, Live In, or Holiday Pay.[10]  (Fernandez Aff. Ex. G; Taveras Aff. Ex. D.[11])  Further, Plaintiffs have not disputed their receipt of these payments.  Defendants thus are entitled to

---

[10] The earnings statements do have a line designated as "Legal Settlem" but that line is blank for "this pay period" and the amounts in that line for year-to-date are self-evidently not related to the overtime and live-in payments at issue given both their relatively trivial amounts ($11.45 for Taveras and $366.95 for Fernandez) and there being other line items specifically labeled as Overtime and Live In.  (*See* Fernandez Aff. Ex. G; Taveras Aff. Ex. D.)  As confirmed at oral argument, the "Legal Settlem" payments correspond to Fernandez and Taveras' share of the collective action settlement in 2019 for the January to October 2015 time period.

[11] The cover sheet for Taveras Exhibit D misidentifies it as Fernandez Exh. D, but the ECF entry bears the relevant description.  (*See* Dkt. 142.)

summary judgment on Plaintiffs' claims that they were not paid properly as a result of lack of requisite sleep or breaks from August 19, 2019 through December 2019.[12]

### 3. All Other Time Periods

As to all other time periods, there is insufficient proof in the record for a reasonable juror to find that Plaintiffs were not paid properly for 24-hour shifts in which they did not get the requisite sleep and breaks.  Plaintiffs offer only generalities, not facts.

A plaintiff "must 'provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week.'"  *Bonn-Wittingham*, 792 Fed. App'x at 75 (quoting *Nakahata*, 723 F.3d at 201).   As the Second Circuit has admonished, "[a]llegations that an employee 'occasionally' or 'typically' missed breaks provides 'nothing but low-octane fuel for speculation, not the plausible claim that is required.'"  *Id.* (quoting *Lundy v. Catholic Health Systems of Long Island Inc.*, 711 F.3d 106, 115 (2d Cir. 2013)).  "Similarly, allegations that an employee 'regularly worked' more than forty hours per week are merely legal conclusions that constitute 'little more than a paraphrase of the statute' and cannot, standing alone, establish a plausible claim.'"  *Id.* (quoting *DeJesus v. HF Management Services, LLC*, 726 F.3d 85, 89 (2d Cir. 2013)).

Here, Plaintiffs' offer nothing but such "low-octane fuel."  Each Plaintiff asserts that she "worked numerous 24 hour shifts for Defendants and was never paid more than 13 hours per shift" (Heredia Decl. ¶ 2); "During [my employment period], I . . . was not paid overtime wages for all of my hours worked over forty in a workweek" (Heredia Decl. ¶ 13);

---

[12] Plaintiffs conceded at oral argument that 2020 time is not at issue given the timing of the end of discovery and Defendants' filing for summary judgment.

"During [my employment period] . . . I was not paid time and one half the New York minimum wage for my hours worked over forty" (Heredia Decl. ¶ 14); "During [my employment period] . . . "I was not paid time and one half my regular hourly rate for my ours worked over 40 in a week" (Heredia Decl. ¶ 15); "I also often worked 24 hour shifts and was illegally only paid for 13 of my 24 hours worked" (Heredia Decl. ¶ 16); "During [my employment period] . . . I was not paid for my hours worked over 40 hours a week . . . at time and one half my regular wages" (Heredia Decl. ¶ 20); "I was never paid any premium for my hours worked over 40 hours in a work week" (Heredia Decl. ¶ 21).  (*See also* Fernandez Decl. ¶¶ 4-7, 11-12; Taveras Decl. ¶¶ 4-7, 11-12.)  Plaintiffs' deposition testimony is to the same effect. (*See, e.g.,* Rand Decl. Ex. H (Taveras Dep.) 77:20-24 ("sometimes" paid for missing hours, "sometimes" have to keep reminding them).)

As can be seen, most of those statements are vague generalities – "numerous," "often," "during," "sometimes" – of the type the Second Circuit has rejected as sufficient to sustain claims for relief.  *Bonn-Wittingham*, 792 Fed. App'x at 75; *Lundy*, 711 F.3d at 115.  And, Plaintiffs' absolute statements that they were "never" paid overtime are demonstrably false as established by the proof that Plaintiffs did receive overtime pay. (*See* discussion above about alleged pay stub discrepancies in 2016 and 2017, as well as payments made for 2019.)  Plaintiffs' assertions merely invite speculation as they lack "sufficient detail about the length and frequency of their unpaid work to support a reasonable inference" that they were not properly paid.  *Bonn-Wittingham*, 792 Fed. App'x at 75.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' overtime claims for all other periods of time.

And, for the same reasons that Defendants are entitled to summary judgment on all of Plaintiffs' overtime claims as set forth above, Plaintiffs' motion for partial summary judgment that Plaintiffs were not paid for their overtime hours must be denied.

## C.   Household Services

The second basis for Plaintiffs' claims of unpaid overtime concerns the type of work they performed before January 1, 2015.   Until January 1, 2015, third-party employers such as Americare could rely on an FLSA overtime exemption for "any employee employed in domestic service employment to provide companionship services for individuals who . . . are unable to care for themselves."   29 U.S.C. § 213(a)(15). Pursuant to implementing regulations, "[c]ompanionship services" were defined as "fellowship, care and protection for a person who . . . cannot care for his or her needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work:  *Provided however*, [t]hat such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked."   29 C.F.R. § 552.6 (1975) (emphasis in original).

An opinion letter issued by the U.S. Department of Labor ("USDOL") expanded on the distinction between household work relating to personal care, as compared to general household work subject to the 20% limitation.  Specifically, "household work that relate[s] to the care of the aged or infirm person," including "meal preparation, bed making, washing of clothes, and other similar services" as well as "cleaning the patient's bedroom, bathroom or kitchen, picking up groceries, medicine, and dry cleaning" are "the type of household work that would be exempt . . . ."  U.S. Department of Labor, Opinion Letter

on Fair Labor Standards Act (March 16, 1995), 1995 WL 1032475 ("DOL Opinion Letter"), at *1. In contrast, "activities involving heavy cleaning such as cleaning refrigerators, ovens, trash or garbage removal and cleaning the rest of a 'trashy' house would be general household work or nonexempt work that is subject to the 20 percent time limitation." *Id.* Courts in this District rely on the DOL Opinion Letter when considering whether the exemption applies. *Heredia I* at *2 (citing *Hypolite v. Health Care Services of New York, Inc.*, 256 F. Supp. 3d 485, 491 (S.D.N.Y. 2017); *Santana v. Brown*, No. 14 Civ. 4279, 2015 WL 4865311, at *3 (S.D.N.Y. Aug. 12, 2015)).

Accordingly, prior to January 1, 2015, the FLSA generally exempted HHAs like Plaintiffs from receiving overtime as HHAs were entitled to overtime pay only if they performed "general household work" not related to care of the client for more than 20% of their hours worked per week.[13] *Heredia I* at *2 (citing cases).

Plaintiffs contend that they were not exempt from overtime under the FLSA's HHA exemption "because they performed more than 20% maid services and therefore were maids." (Dkt. 136, Plaintiffs' Memorandum of Law ("Pl. Mem.") at 9.) Defendants argue they are entitled to summary judgment on this aspect of Plaintiffs' claims because Plaintiffs' own testimony confirms that they did not perform non-exempt cleaning tasks more than 20% of the time. (Dkt. 156, Defendants' Reply in Further Support of their Motion for Summary Judgment ("Def. Reply") at 11-12.) Defendants are correct.

---

[13] In January 2015, a USDOL interpretive regulation took effect, barring third-party employers, such as Americare, from relying on the exemption. *See* 29 C.F.R. § 552.109; *Heredia I* at *2. Americare does not dispute that it cannot rely on the exemption as of January 2015.

To begin, each of Plaintiff's Declarations contains the identical statement that "I spent at least 30% of my time directly performing household work."[14]  (Heredia Decl. ¶ 32, Fernandez Decl. ¶ 23, Taveras Decl. ¶ 23.)  This statement is notably non-specific as to the type of housework performed.  As the regulation and DOL Opinion Letter make clear, however, only certain type of housework counts toward the 20% limitation.  Exempt household work is "household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services."  DOL Opinion Letter, 1995 WL 1032475, at *1.  Non-exempt household work is "general household work" such as "heavy cleaning" that is not related to the care of the client.  29 C.F.R. § 552.6 (1975); DOL Opinion Letter, 1995 WL 1032475 at *1.  The claim that each Plaintiff spent at least 30% of their time "directly performing household work" is meaningless with respect to determining whether and to what extent any of that "household work" was or was not of the non-exempt variety.

Each of Plaintiffs' Declarations also contain identical language explaining tasks they performed, such as preparing food, washing clothes, making beds, cleaning the bathroom and the kitchen, doing dishes, and other tasks that are expressly included within the examples of exempt work.  (*See* Heredia Decl. ¶¶ 22-31, Fernandez Decl. ¶¶ 13-22, Taveras Decl. ¶¶ 13-22.)  Plaintiffs do generally identify some activities that fall into the non-exempt "general household work" category, such as "cleaning the entire house," "taking out trash," and "clean[ing] out the refrigerator" but they do not indicate at all how much or what relative amount of time they devoted to such tasks.  As with Plaintiffs' vague

---

[14] Neither of Plaintiffs' Affidavits mention at all any hours they devoted to non-exempt work.

generalities about their sleep and break time, their vague and non-specific statements about performing "household work" are insufficient to sustain their claim based on time devoted to non-exempt household work.  *See Bonn-Wittingham*, 2019 WL 6273405 at *2-3 (affirming dismissal of similar vague claims by HHAs as to performing chores "beyond that which is expected of home healthcare aides").

Although determining whether particular work is of the "general household" variety is "highly fact specific," *Heredia I* at *2, Defendants' own deposition testimony demonstrates that they did not spend more than 20% on non-exempt work.  Heredia, for example, performed the following tasks: cooking, cleaning the bathroom, doing laundry, going grocery shopping, changing bedsheets, reminding patients to take medication, taking patients to appointments, bathing, dressing, applying lotions/creams, taking care of dentures, changing patients' diapers, going for walks with a patient, and helping her patients with a wheelchair inside and outside of the house.  (Pl. 56.1 Response ¶¶ 52, 66, 68, 76.)  Those tasks all fall within exempt household work for personal care and protection of the patient.  29 C.F.R. § 552.6 (1975); DOL Opinion Letter, 1995 WL 1032475, at *1.

Plaintiffs deny, however, that Heredia never performed any heavy-duty housework or work that was not for the care and protection of the patient, contending that Heredia cleaned and cooked for numerous relatives of her patients living in the household.  (Pl. 56.1 Response ¶ 58.)  But the deposition pages cited in support of that denial, and others not cited, tell a different story.  For one of her cases, Heredia took care of a woman with dementia who lived with her 50 to 60 year-old daughter and two grandchildren (ages 16 and 20).  (Dkt. 131 at 4; Dkt. 115-1 at 9.)  Heredia admitted that she did not cook, do

laundry, shop or perform any other duties for the patient's family other than cleaning dishes in the sink. (Pl. 56.1 Response ¶¶ 53-57.)  Heredia also scrubbed the apartment's only bathroom twice a week for 40 minutes each. (Dkt. 115-1 at 14.)  Assuming for purposes of this motion that the bathroom scrubbing falls into the heavy non-exempt work category, the 80 minutes per week devoted to that task indisputably did not get anywhere near close to 20% of her time, given that Heredia worked 24-hour shifts four days a week. (*Id.*)  Even including time for cleaning dishes that were left by others, no reasonable juror could conclude that Heredia's non-exempt work for this patient even approached the 20% threshold.

For another case, Heredia worked for a woman whose granddaughter lived with her in a two-bedroom apartment. (Dkt. 115-1 at 28.)  Heredia cleaned up after the woman's cat and initially suggested that because the granddaughter lived in the apartment, Heredia "had to clean everything [and] wash everything." (Dkt. 131 at 12; Dkt. 115-1 at 31.)  But Heredia conceded that everything she did was within the patient's plan of care and agreed that "it was important to keep the apartment clean" for her patient. (Dkt. 115-1 at 31-32.)  Heredia thus was doing nothing more than household work for the care and protection of her patient, and nothing in the record suggests that she performed any general household work that a reasonable juror could conclude came anywhere close to 20% of her work time.

In a third case, Heredia worked for a woman who lived with her husband in a one-bedroom apartment. (Dkt. 115-1 at 34-36.)  Heredia initially worked four 24-shifts per week but later reduced to three shifts. (*Id.* at 34.)  Heredia cooked meals for both the patient and her husband. (*Id.* at 36.)  According to Heredia, the husband "wanted me to

do everything for him, to take care of him, to wash his clothes, to do everything for him,"
but Heredia does not say that she actually did any of those things. (Dkt. 131 at 13-14.)
Heredia did do additional work, however, for the woman's daughter and grandson who
stayed with them about three times a year for two to three weeks at a time. (*Id.* at 14.)
During those visits, Heredia had to clean up the bathroom because of its use by the
daughter and grandson, and she also cooked for the daughter and grandson. (*Id.* at 14-
15.) Again, nothing in the record suggests that any of that extra work came anywhere
close to 20% of Heredia's work time. Given all the other tasks she did for the patient –
including, to name some, doing her laundry, cooking her meals, taking care of her skin,
shopping for her, and going on many outings with her patient who could not cross the
street alone – no reasonable juror could conclude that Heredia performed non-exempt
work more than 20% of the time, even for the few times that the patient's daughter and
grandson stayed with them.

The same is true of Taveras. At the time of her deposition, she was taking care of
two patients, a woman with Alzheimer's and her husband, working three 24-hour shifts
per week. (Pl. 56.1 Response ¶¶ 90-91.) Taveras performed a number of exempt tasks
such as cleaning to maintain a sanitary environment for the patient's health and safety,
preparing meals and accompanying the wife for shopping. (Pl. 56.1 Response ¶¶ 92-93.)
Taveras testified that, other than making some extra rice and beans for the woman's
daughter who visited two weeks a year, she did not ever perform any services for other
family members of any patients. (Dkt. 115-7 at 10-11; 13-14.) The testimony that Plaintiff
cites to deny this does not address the point at all (Pl. 56.1 Response ¶ 95), nor could it
given Taveras' own testimony.

Finally, Fernandez fares no better.  As of her deposition, Fernandez had had a total of three patients, two of which were "just to fill in for someone else."  (Pl. 56.1 Response ¶ 103.)  Fernandez worked four 24-hour shifts per week for a woman and later her husband as well.  (Pl. 56.1 Response ¶¶ 104-05.)  Fernandez performed a number of exempt tasks, including doing laundry, cooking, bathroom cleaning, bathing, grooming dusting, shopping, and the like.  (Pl. 56.1 Response ¶¶ 106-108.)  Additionally, Fernandez performed heavier house cleaning, although exactly what she did not say, twice a week for two to three hours each time.  (Pl. 56.1 Response ¶ 109.)  Fernandez's heavy cleaning thus accounted for only up to six hours out of three or four 24-hour shifts.  Two or three weeks a year, Fernandez cooked for the woman's daughter who was visiting.  (Pl. 56.1 Response ¶ 111.)  Plaintiffs deny that Fernandez did nothing else for the visiting daughter (Pl. 56.1 Response ¶ 112), but, once again, the deposition testimony cited in support of such has nothing to do with that issue.  Rather, it is a page on which Fernandez was asked how much of her time would she say was spent taking care of the house and not the patient and responded "I imagine more than 20 percent," followed by "more or less." (Dkt. 132 at 11.)  That testimony does not advance the ball for Fernandez because it is mere conjecture ("I imagine"), equivocal ("more or less"), and, more significantly, many tasks associated with "taking care of the house" are exempt.  No reasonable juror could find based on the evidence of record that Fernandez, or any of the Plaintiffs, worked more than 20% non-exempt hours.

## D.    NY Wage Parity Act Minimum Wage

Finally, Plaintiffs' opposition briefly addresses the issue of minimum wage under New York's Wage Parity Act for 2014 and 2015.  (Pl. Mem. at 12.)  After March 1, 2014,

the WPA required that HHAs be paid "total compensation" of $14.09 an hour, at least $10 of which had to be base pay, up to $2.40 could be health benefits, and up to $1.69 could be in additional compensation, including "supplements in lieu of benefits and compensated time off." *Carrasco*, 2017 WL 6403521 at *10 (citing N.Y.P.B.H. § 3614-c(b)).  Plaintiffs' only asserted basis for opposing dismissal of that claim is that Defendants have not submitted proof that Plaintiffs were paid wages and benefits equal to $14.09 for those two years.  But that is a dodge.  Nothing in the record suggests that Plaintiffs did not receive the requisite combination of wages and benefits, and what evidence there is suggests that they did.

Indeed, nothing in Plaintiffs' Declarations and Affidavits raise any issue about failure to receive the requisite minimum compensation plus benefits for 2014 and 2015 (or any other year for that matter).  Instead, Plaintiffs' Declarations vaguely assert that "During [their period of employment] I was not always paid federal and New York minimum wages." (Heredia Decl. ¶ 14; Fernandez Decl. ¶ 5; Taveras Decl. ¶ 5.)  What's more, the Complaint suggests that the minimum wage issue is not even tied to the issue of pay-plus-benefits but instead is tied to the 24-hour shift issue.  Specifically, the Complaint alleges that Plaintiffs received "an hourly rate of between $8 per hour and $12 per hour for only 13 hours of their 24 hours shifts which was below minimum wage when applied to the entire 24 hours worked . . . ."  (Compl. ¶ 37.)  Discovery has yielded nothing on which a reasonable juror could rely to find that Plaintiffs did not receive the requisite amount of total compensation of wages and benefits.  *Cf. Rodriguez*, 2018 WL 1582433 at * 9 (finding factual dispute as to whether value of additional benefits were worth $4.09).

Moreover, the record contains undisputed evidence that Defendants did in fact pay the requisite minimum wage rate.  Each of the Defendants signed wage notice statements informing them of their pay.  In February and March 2014, Plaintiffs were informed that their regular rate of pay was $10 per hour – exactly what the WPA required at the time (and the following year) as the base pay before benefits and other compensation. (O'Connor Decl. Exs. C, I, S.) *See Carrasco* at *10 (denying class and collective certification where pay stubs showed base pay of $10 and there was no evidence that defendants did not offer benefits and additional compensation).  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' wage claims under the Wage Parity Act.

### III.   Plaintiffs' Wage Notice and Statement Claims

Plaintiffs' Second Cause of Action includes allegations that Americare violated New York's Wage Theft Prevention Act (the "WTPA") requirements that employers provide employees with a yearly wage notice and regular pay statements setting forth their actual hours and pay and other information.  (Compl. ¶ 71.)  The undisputed proof shows otherwise, entitling Defendants to summary judgment on Plaintiffs' wage notice and statement claims.

### A.   Wage Notice Claims

New York law requires employers to provide employees at the time they are hired with a notice, in English and in the primary language of the employee, containing information about their pay, including the regular ate of pay and the basis of payment, whether by hour, shift, day, week, salary or other, as well as the overtime rate of pay. NYLL § 195(1)(a).   Employers also must obtain a signed and dated written acknowledgment from the employee that they have received the notice.  *Id.*  Between

April 9, 2011 (effective date of the WTPA) and February 27, 2015 (when the WTPA was amended), employers were required to provide this wage notice on a yearly basis. Although statutory damages are available for violations of the wage notice provision NYLL § 198(1-b), a private right of action is available to an employee "whose employer fails to provide the initial notice at their hire, but not for subsequent failures to furnish the annual notice in following years." *Yuquilema v. Manhattan's Hero Corp.*, No. 13 Civ. 461, 2014 WL 4207106, at *11 (S.D.N.Y. August 20, 2014).

The evidence indisputably shows that Americare complied with the wage notice requirement. Fernandez and Taveras were hired in 2010, before enactment of the wage notice requirement. (Pl. 56.1 Response ¶ 78, 102; Dkt. 115-7 at 4 (Taveras Dep.); Dkt. 115-15 at 4 (Fernandez Dep.).) Heredia was hired on or around January 31, 2012. (Pl. 56.1 Response ¶ 45; Dkt. 115-1 at 5.) She received a wage notice and signed an acknowledgment when she was hired. (Pl. 56.1 Response ¶ 45; Dkt. 131 at 16; O'Connor Decl. Ex. C at 67.) All three Plaintiffs received subsequent wage notices both when they went through reorientation and when their wage rate changed. (Pl. 56.1 Response ¶¶ 43-44; Dkt. 115-22 at 6-7; O'Connor Decl. Exs. C, I and S.)

In opposition, Plaintiffs concede that Americare provided Plaintiffs with wage notices but argues that they are non-compliant because they do not identify the correct rate of pay and overtime rate. (Pl. Mem. 12-13.) That argument, however, is entirely dependent on Plaintiffs' minimum wage and overtime claim. As Defendants are entitled to summary judgment on that primary claim, they necessarily are entitled to summary judgment on the wage notice claim. And, even if summary judgment was not warranted on the minimum wage and overtime claim, summary judgment still would be warranted

on the wage notice claim.  The parties dispute whether Plaintiffs received pay that they were due, but the fact remains that Americare provided Plaintiffs with the requisite wage notices.  Indeed, Plaintiffs admit that Plaintiffs received notices regarding their rates of pay.  (Pl. 56.1 Response ¶¶ 43-45, 79-80.)

## B.    Wage Statement Claims

In addition to a wage notice, New York law also requires employers to include with every payment of wages a statement containing a variety of pay-related information such as the pay-period covered, the regular rate of pay, the overtime rate of pay, and the number of both regular hours and overtime hours worked.  NYLL § 195(3).  Plaintiffs admit that Americare provided them with pay statements.  (Pl. 56.1 Response ¶ 48, 81; Dkt. 115-1 at 40 (Heredia Dep.); Dkt. 115-7 at 38 (Taveras Dep.); Fernandez Decl. ¶ 8, Ex. A.)  And although Plaintiffs' opposing brief addresses the subject, Plaintiffs appear to have blindly recycled a portion of a brief from a different case, which contends that someone named "Rodriguez" did not receive pay statements and cites to a statement of fact that is irrelevant to the wage statements provided to Plaintiffs.  (*See* Pl. Mem. at 13.)

The evidence is undisputed (indeed, Plaintiffs admit) that Plaintiffs received both wage notices and wage statements.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' wage notice and wage statement claims under the WTPA.

## IV.    Plaintiffs' Other Claims

Plaintiffs' claims include two for breach of contract:  one direct (Sixth Cause of Action), and one as alleged third-party beneficiaries of Medicaid reimbursement contracts between Americare and New York State requiring Americare to pay wages compliant with the Wage Parity Act (Third Cause of Action).  Defendants expressly seek and advocate

for summary judgment on these claims.  (*See* Def. Mem. at 14-16.)  Plaintiffs' opposition, however, makes no mention of their breach of contract claims, and the Court may therefore consider them abandoned.   *See Kovaco v. Rockbestos-Suprenant Cable Corporation,* 834 F.3d 128, 131-32 (2d Cir. 2016) ("we hold that to the extent [plaintiff] pleaded hostile-work-environment claims in his amended complaint, he subsequently abandoned those claims in opposing [defendant]'s motion for summary judgment in the District Court by failing to address them in his brief); *Collins v. City of New York*, 295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018) (agreeing that summary judgment should be granted on several claims that plaintiffs did not defend in their opposition to summary judgment). The Court agrees that the Plaintiffs have abandoned their breach of contract claims and that summary judgment on those claims is therefore appropriate.

In any event, Plaintiffs' breach of contract claims stand or fall with their minimum wage and overtime claims.   Inasmuch as the wage claims do not survive summary judgment on the record in this case, neither can the breach of contract claims.   The same is true for Plaintiffs' claim for unjust enrichment (Fourth Cause of Action).

## V.     Plaintiffs' Claims Against Kleinman

Plaintiffs assert all their claims against Kleinman individually.  Given that each of those claims fails on the merits, Kleinman is entitled to summary judgment on them along with Americare.   But there is an additional basis for granting summary judgment to Kleinman.   Defendants argue that Kleinman cannot be liable to Plaintiffs because he cannot be considered their employer.  Plaintiffs assert that "on information and belief," Kleinman, had the power to hire and fire Americare employees, determined their pay, and exhibited other indicia of being their employer.   Those assertions, however, are not

supported by admissible evidence and are insufficient to sustain Plaintiffs' opposition to Kleinman's motion.

The FLSA imposes liability on "any employer who violates [its] provisions." 29 U.S.C. § 216. The Act defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has recognized the "expansiveness" of this definition, *Falk v. Brennan*, 414 U.S. 190, 195, (1973), and counseled courts to evaluate the "economic reality" of the specific employment relationship. *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33, (1961). Accordingly, employer status under the FLSA does not require "absolute control of one's employees," nor does it require constant physical presence or "continuous monitoring of employees, looking over their shoulders at all times." *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

At the same time, employer status is not simply based on a title, such as CEO. Indeed, "[o]wnership, or a stake in a company, is insufficient to establish that an individual is an 'employer' without some involvement in the company's employment of employees." *Irizarry v. Catsimatidis*, 722 F.3d 99, 111 (2d Cir. 2013); *see also Bravo v. Eastpoint International, Inc.*, No. 99–CV–9474(WK), 2001 WL 314622, at *2 (S.D.N.Y. Mar.30, 2001) (dismissing claim against fashion designer Donna Karan as employer under the FLSA because plaintiffs only alleged her status as the owner and chairperson of employer company and failed to allege facts establishing her power to control the plaintiff workers); *Juarez v. Precision Apparel, Inc.*, No. 12 CV 2349, 2013 WL 5210142, at *6 (E.D.N.Y. Sept. 13, 2013) (A "defendant's status as a CEO does not, in itself, qualify a defendant as an employer under the FLSA."); *Wilk v. VIP Health Care Services.*, No. 10–CV–5530,

2012 WL 560738, at *7 (E.D.N.Y. Feb. 21, 2012) (finding that, to qualify as an "employer" under the FLSA, CEO needed to also satisfy the "economic reality" test by possessing the ability to hire and fire employees, etc.*); Franco v. Ideal Mortgage Bankers, Ltd.*, No. 07–CV–3956, 2011 WL 317971, at *7 (E.D.N.Y. Jan. 28, 2011) (denying summary judgment in favor of plaintiffs as to liability of CEO under the FLSA because plaintiffs failed to demonstrate that he exercised the required degree of control).

Rather, the Court must evaluate the "totality of the circumstances" surrounding the employment relationship. *Irizarry*, 722 F.3d at 104. "The underlying inquiry in determining 'employer' status is whether the individual possessed operational control over employees: 'control over a company's actual 'operations' in a manner that relates to a plaintiff's employment.'" *Tapia v. Blch 3rd Ave LLC*, 906 F.3d 58, 61 (2d Cir. 2018) (quoting *Irizarry*, 722 F.3d at 109). As all parties recognize, the Second Circuit uses the "economic reality" test to determine whether someone is an employer. (Def. Mem. at 19; Pl. Mem. at 14.) That analysis focuses on four non-exclusive criteria known as the *Carter* factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry,* 722 F.3d at 104-05 (citing *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984)). No single factor is controlling. *Irizarry*, 722 F.3d at 115.

In an effort to provide support for each of those facts, Plaintiff Heredia states "upon information and belief" that Kleinman exercised operational control over Americare home health aide employees, made decisions directly affecting the nature and conditions of their employment, had the power to hire and fire, supervised and controlled schedules,

36

conditions and policies, determined the rate and method of pay, and maintained employment records.  (Heredia Decl. ¶¶ 9-11.)  These assertions, however, simply mimic the legally relevant factors, are merely conclusory, and provide no facts to support her "information and belief."  In short, Heredia's statement does not provide admissible testimony by which a reasonable jury could find Kleinman personally liable.[15]

Plaintiffs also rely on Kleinman's being the owner and CEO of Americare.  But, as explained above, holding that position alone "does not, in itself, qualify" Kleinman as an employer for purposes of the FLSA and NYLL.  *Juarez,* 2013 WL 5210142 at *6 (collecting cases).  And, unrebutted evidence in the record establishes that other Americare officers perform responsibilities that comprise the *Carter* factors.  For instance, another Americare officer, Vice President Bridget Gallagher, oversees the healthcare agency's operations.  (Dkt. 115-21 at 4.)  Gallagher also oversees the employee termination process (*Id.* at 16), while another officer, Chief Financial Officer David Helfgott, negotiates rates of pay with the Plaintiffs' union (*Id.* at 18).[16]

---

[15] Plaintiffs also point to Heredia's deposition testimony about what she heard from other persons in regard to Kleinman.  (Pl. 56.1 Response ¶ 6.)  That, of course, is inadmissible hearsay.  *See* Federal Rule of Evidence 801, 802.  Finally, Plaintiffs point to deposition testimony from Taveras that she recalls seeing Kleinman's signature on letters she received when "they send something to be signed," the only of which she could recall had to do with a physical exam form.  (Pl. 56.1 Response ¶ 6.)  Such vague, general testimony does not provide fodder for a reasonable juror to conclude that Kleinman qualifies as an employer.  *See Contemporary Mission v. United States Postal Service*, 648 F.2d 97, 107 n. 14 (2d Cir.1981) ("opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions") (internal citations and quotation marks omitted); *Coley v. Vannguard Urban Improvement Association, Inc.*, No. 12-CV-5565, 2014 WL 4793825, *5 (E.D.N.Y. Sept. 24, 2014) (evidence that "vaguely suggest[s]" individual's participation in managerial affairs insufficient to confer employer status).

[16] As there is testimony in the record about who controls certain aspects of employment (operations, pay and termination), Plaintiffs gain no ground by relying on the absence of

As evidence of Kleinman's being Plaintiffs' employer, Plaintiffs point to the fact that Kleinman occasionally meets with Vice President Gallagher and the Vice President of Human Resources, and was involved in a meeting regarding discipline of the company's Chief Information Officer.  (Pl. Mem. 14; Pl. 56.1 Response ¶ 6; Dkt. 134 at 5-7; Dkt. 135 at 6.)  That the CEO meets with his officers and had some vague involvement in discipline of another officer doesn't support any of the *Carter* factors with respect to control over Plaintiffs' employment.  The evidence on which Plaintiffs rely to establish Kleinman's liability does not even qualify as a "scintilla" of evidence that is itself insufficient to sustain opposition to summary judgment.

In sum, Defendants are entitled to summary judgment on Plaintiffs' claims against Kleinman.

## Conclusion

For the foregoing reasons, Defendants Motion for Summary Judgment is GRANTED and Plaintiffs' Cross-Motion for Summary Judgment is DENIED.  JUDGMENT shall be entered in favor of Defendants and the case dismissed with each party to bear their own costs.  The Clerk of Court is respectfully requested to terminate all motions and close the case.

---

any affirmative testimony from Kleinman attesting to what powers he does or does not have.  (*See* Pl. Mem. at 14.)  In their response to Defendants' statement of undisputed facts, Plaintiffs deny the statement that the HHA's rates of pay are determined by negotiations with the union (Pl. 56.1 Response ¶ 7), but the purported support for that denial does not address that issue at all (rather, the citations are merely to the vague, general and otherwise inadmissible statements regarding Kleinman discussed in the previous footnote).  Accordingly, based on the actual record, the fact that rates of pay are determined by negotiations with the union is undisputed.

SO ORDERED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  July 13, 2020
        New York, New York